Carter and another *vs.* Jordan, adm'x, &c.

No. 5.—FARISH CARTER and another, plaintiffs in error, *vs.* MARY J. JORDAN, adm'x, &c. defendant in error.

[1.] "Equity follows the Law", has become the first maxim of Equity.

[2.] Under this maxim, with facts such as are those in this case, a Court of Equity has no jurisdiction for *relief*, against a person out of the county of his residence.

[3.] But it has for discovery.

[4.] A bill for discovery, will lie against one who has in the Common Law suit, an interest of such a kind as makes him, in effect, *a party* to that suit, although he is not named in it as a party.

[5.] An order *absolute*, to take a bill for confessed, provided it is not answered by a particular time, cannot be made at the *first* term of a bill.

In Equity, in Troup Superior Court. Tried before Judge HILL, May Term, 1853.

At the May Term, 1850, of Troup Superior Court, Benjamin. S. Jordan of Baldwin county, commenced his action of debt, against Mary J. Jordan, as administratrix of Warren Jordan, on a promissory note, made by the said Warren to him, the said Benjamin S. in 1841, for $4,360.

Pending the action, Mrs. Jordan filed her bill against Benjamin S. Jordan and Farish Carter, charging, that in 1839 Warren Jordan executed to the Georgia Rail Road & Banking Company, his deed of mortgage, in and to a large settlement of land in Hall county—several lots in the town of Gainesville, three thousand acres of land in Baker county, and some sixty negroes, to secure the payment of a note due said Company, for $22,500 00—the whole of said debt to be paid in five annual instalments; that the said Warren, by successive payments, reduced said debt to about $15,000, when, in 1842, the Company transferred the mortgage to Farish Carter, then and now of the county of Baldwin, in said State; that in 1842, Carter obtained judgment against one Wilchel and Warren Jordan, as indorser for $5,000, and obtained control of a judgment in favor of Adam G. Saffold, against Reuben Thornton and Warren Jordan.

The bill alleges that about this time, Warren Jordan was in feeble health, and his mind greatly impaired, so that he was unable to attend to business with safety and correctness, and was a fit subject for fraud; that said Benjamin S. and Farish combined for the purpose of defrauding the said Warren, and concocted a plan whereby to secure to themselves the property conveyed in the said mortgage; that in every act of sale or purchase charged in the bill, both the said Benjamin S. and Farish were jointly interested, and that they shared in the profits of every fraud perpetrated by them, or either of them, upon the said Warren; that the said Farish entered into an engagement with Wilchel, not to press him on the said *fi. fa.* in order that he might keep the same open against the said Warren; that the said Farish caused the said *fi. fa.* and the one in favor of Adam G. Saffold, to be levied upon the Hall county lands, conveyed by the mortgage deed, to the Georgia Rail Road Company, and also on a part of the negroes, which were brought to sale on the first Tuesday in July, 1842. Carter was present at the sale, and did everything to prevent the property from bringing a fair price. Among other things, causing the whole of the lands to be put up at once, when purchasers desired it to be divided into smaller portions. He also caused it to be proclaimed, that it was sold, subject to the Georgia Rail Road mortgage, which would be at once foreclosed. He begged other creditors and the friends of the family of Warren Jordan, not to interfere with the plans of himself and the said Benjamin S. whereby he bought the said property for a mere nominal sum. The bill set forth an agreement between the said Benjamin S. and Farish, and one Reuben Thornton, in substance, as follows:

" GEORGIA—HALL COUNTY:

That in consequence of many intricate and unsettled matters, connected with and growing out of the affairs of Warren Jordan, the aforesaid parties, to-wit: Benjamin S. Jordan and Farish Carter, of the one part, and Reuben Thornton, for himself, and as agent for Warren Jordan, on the other part, being

interested therein, and being desirous, as far as possible, to avoid litigation and unnecessary expense and trouble, and being desirous to save and secure something to the family of the said Warren, after the payment of the debts due to the parties of the first part, the said parties do agree that the business and affairs of the said Warren shall be closed and settled upon the following basis : The aforesaid parties of the first part, promise and agree to collect together and dispose thereof, to the best possible advantage, for cash, all the property, both real and personal, belonging to the said Warren Jordan, becoming the purchasers of such portions thereof, as may not produce a fair and reasonable price at Sheriff's sales, re-selling the same for the best cash price it will produce, from which fund, thus raised from the sale of the property of the said Warren, is to be paid the parties of the first part, all the claims and demands . they hold against the said Warren, together with the necessary sum for the expenses incurred by them in settling said business ; and the balance, whatever there may be left, after the payments, as aforesaid, are made, shall be secured by the aforesaid parties of the first part, to the wife and children of the said Warren, in the manner and form hereinafter pointed out.— Secondly, the said Thornton, both for himself and as agent aforesaid, hereby covenants and agrees, upon his part, that . he will use all due and lawful exertions, whensoever desired, so to do, to aid in the discovery, collecting together and condemning the property belonging to the said Warren.

In- witness whereof, the contracting parties have hereunto annexed their hands and seals, and mutually exchanged this agreement, this, the 23d day of September, 1842.

FARISH CARTER, [L. s.]

B. S. JORDAN, [L. s.]

REUBEN THORNTON, [L. s.]

WARREN JORDAN, [L. s.]

By his authorized agent, Reuben Thornton.

The bill charges that Thornton faithfully executed his part of the ageeement, while the said Benjamin S. and Farish vio-

lated it in every particular, except that they collected the property and purchased it at Sheriff's sale, but never caused it to be re-sold; on the contrary, appropriated it to their own use. The bill charges that had they carried out, in good faith, the agreement, all the debts against Warren Jordan would have been paid, and a remainder of at least $75,000, been left in their hands.

The bill goes on to charge the sale of a portion of the mortgaged negroes, in the State of Florida, by the Marshall of said State, under and by direction of the said Benj. S. and Farish, they having foreclosed the said mortgage, which were bid off for $9,000, (when they were worth $18,000,) by an agent of the said Benj. S. and Farish. Also, the sale of the lands in Baker county, under the said mortgage, by the Sheriff of said county, when the said Benjamin S. and Farish, through various devices and schemes, as charged in the bill, were enabled to bid off said lands, at prices far below their real value. The bill sets forth the death of Warren Jordan, in 1842. The bill, among other things, prays that the mortgage deed, and the notes thereby secured, and the note sued on at Common Law, may be decreed as fully paid off. It also prays an injunction of the Common Law action, and for general account and relief.

To this bill, the defendants demurred for the want of jurisdiction; and at the same time, pleaded to the jurisdiction of the Court, and supported said pleas by their answers.

The Court over-ruled the demurrer and plea, and ordered the defendants to answer the bill by the first day of the next Term of the Court; and on failure to do so, the bill be taken as confessed.

To which ruling of the Court, counsel for defendants excepted.

H. WARNER and McDONALD, for plaintiffs in error.

B. H. HILL, for defendant in error.

Carter and another *vs.* Jordan, adm'x, &c.

*By the Court.*—BENNING J., delivering the opinion.

The bill in this case, is for both discovery and relief. It was brought in the county of Troup. The defendants resided in the county of Baldwin. One of the defendants had sued the plaintiff, at Law, in the county of Troup; and the object of the bill, in part, is to enjoin that suit, and to discover evidence by which to defend it.

The defendants insisted, that, as they resided in Baldwin, and the suit against them was in Troup, the Court had no jurisdiction over them. They did this, both by demurrer and by plea. The Court over-ruled them, and held that it had jurisdiction. Was the Court right? This is the great question in the case.

[1.] *Æquitas sequitur legem* has become the highest maxim of Equity. In a great case, Sir *Joseph Jekyll* says: "the Law is clear, and Courts of Equity ought to follow it in their judgments, concerning titles to equitable estates—otherwise great uncertainty and confusion would ensue; and though, proceedings in Equity are said to be *secundum discretionem boni viri*, yet, when it is asked, *vir bonus est quis?* the answer is, *qui consulta patrum, qui leges juraque servat.* And, as it is said in *Rook's Case,* (5 *Rep.* 99, *b.*) that discretion is a science, not to act arbitrarily according to men's wills and private affections, so the discretion which is executed here, is to be governed by the rules of Law and Equity, which are not to oppose, but each, in its turn, to be subservient to the other.— This discretion, in some cases, follows the Law implicitly—in others assists it, and advances the remedy; in others again, it relieves against the abuse, or allays the rigor of it; but in no case does it contradict or overturn the grounds or principles thereof, as has been sometimes ignorantly imputed to this Court. That is a discretionary power, which neither this nor any other Court—not even the highest, acting in a Judicial capacity is, by the Constitution, entrusted with". *Cowper vs. Earl of Cowper,* (2 *Peere-Williams,* 753.)

Is there, then, any rule of law, as to the counties in which persons are to be sued? There is. In all "civil cases", except cases "respecting the titles to lands", and except cases against joint obligors or joint promisors, the Constitution itself requires persons to be sued in the counties in which they reside. In the Constitutions, both of 1777 and of 1789, this requisition was broader. In them, the requisition was, that *all* cases, except those concerning real estate, should be tried in the county in which the defendant resided. The insertion of such requisitions, by the people of Georgia, in every Constitution which they have made, is strong evidence, too, that they deemed a restriction of the right of suit to the county of the defendant's residence, to be a matter of vital importance.

The rule, however, is only applicable to such cases as are "civil cases". And this Court has determined the expression, "civil cases," as used in the Constitution of 1798, not to include cases in Equity. *Gilbert vs. Thomas and others,* (3 *Ga. Rep.* 578.) Be that so, still, "the grounds and principles" of the rule include cases in Equity. In Equity cases, there are appeals, *ne exeats,* stays of execution, judgment liens and so forth, the same as in cases at Law. And the county of one's residence, is the place in which it is easiest for him to find sureties and bail, in cases of the one sort, or in cases of the other.

So when you wish to discover whether there are any judgment liens upon a man's property, who asks you for credit, there is no more reason why you should be forced to run into every county in the State, to look for judgments in Equity against him, than there is why you should do so, to look for judgments at Law.

The "grounds and principles" of the rule which requires persons, in "civil cases", to be sued in the counties of their residence extend, therefore, to cases in Equity.

Are there no exceptions to this rule? It is argued for the plaintiff in error, that the case made in the bill, is an exception to it; that that case is one of those cases which is governed by

the assumed rule, that "where a party has a just title to come into Equity for a discovery, and obtains it, the Court will go on and give him the proper relief, and not turn him round to the expenses and inconveniences of a double suit at Law".— (1 *Story Eq.* §64, *k.*)

Of this rule, Judge Story says, "Mr. Fonblanque has remarked, 'there are some cases in which, though the plaintiff might be relieved at Law, a Court of Equity having obtained jurisdiction for the purpose of discovery, will entertain the suit for the purpose of relief. But there certainly are other cases when, though the plaintiff may be entitled to discovery, he is not entitled to relief. To strike out the distinguishing principle upon which Courts of Equity have in such cases proceeded, would be extremely useful. But after having given considerable attention to the subject, I find myself incapable of reconciling the various decisions upon it'. What the learned author desired to ascertain, has been found to be equally embarrassing to subsequent inquirers; and there is a distressing uncertainty in this branch of Equity Jurisdiction in England". (*Id.* §66.)

The idea that such a *rule* as this exists, was, in a late case, treated rather contemptuously, by Vice Chancellor *Wigram.* He said, "the first proposition relied upon by the plaintiff, in support of the equity of his bill, was this: that the case was one in which the right to discovery, would carry with it the right to relief. And, undoubtedly *dicta* are to met with, tending directly to the conclusion, that the right to discovery may entitle a plaintiff to relief also. In *Adley vs. The Whitstable Company,* (17 *Ves.* 329,) Lord *Eldon* says, "there is no mode of ascertaining what is due, except an account, in a Court of Equity; but it is said, the party may have discovery and then go to Law. The answer to that is, that the right to the discovery carries along with it the right to relief in Equity". In *Ryle vs. Haggie,* (1 *Jac. & Walk.* 236,) Sir *Thomas Plumer* said, "when it is admitted that a party comes here properly for the discovery, the Court is never disposed to occasion a multiplicity of suits, by making him to go to a Court of Law for relief". And in *McKenzie vs. Johnson,* (4 *Madd.* 373,)

Sir *J. Leach* says, , 'the plaintiff can only learn from this discovery of the defendant's, how they had acted in the execution of their agency; and it would be most unreasonable, that he should pay them for that discovery, if it turned out · that they had abused his confidence—yet, such must be the case, if a bill for relief will not lie".

"Now, in a case in which I think that justice requires the Court, if possible, to find an. equity in this bill, to enable it once for all, to decide the question between the parties, I should reluctantly deprive the plaintiff of any remedy to which the *dicta* I have referred to, may entitle him. But I confess, the arguments founded upon these *dicta*, appear to me to be exposed to the objection of proving far too much. They can only be reconciled with the *ordinary practice* of the Court, by understanding them as having been uttered with reference, in each case, to the subject-matter to which they were applied, and not as laying down any abstract proposition, so wide as the plaintiff's argument requires. I think this part of the plaintiff's case, cannot be stated more highly in his favor than this: that the necessity a party may be under, (from the very nature of a given transaction,) to come into Equity for discovery, is a circumstance to be regarded, in deciding upon *the distinct and independent question of equitable jurisdiction.* Further than this, I have not been able to follow the plaintiff's argument". (2 *Hare. R.* 293.) I quote from *note* 1 *to section* 64, *k, of Story's Eq. Jur.* The italics, except of the word *dicta*, are mine.

It is not necessary to say whether we do not consider the Vice Chancellor to be right or not. In reply to the argument, that this supposed rule applies to the case in hand, it is sufficient to say:

1. That it has never been applied to such a case in England —such a case could never have arisen in England. The question of the residence of the defendant, as affecting the right of suit against him, cannot arise there, because the Court of Chancery there, sits at but one place, and every person who

can be sued at all, has, of course, to be sued at that place, no matter where he resides.

2. That this rule, if it is one, comes, in the present case, in conflict with the rule, " equity follows the law", which is the superior rule ; and so it must yield to that rule.

3. That this rule, if it exists, may, in another way, be made available to the plaintiff in the bill, if she chooses to avail herself of it. She may file a bill, just such as the present one is, *in the county of the residence of the defendants*, and by that bill, get the relief she prays for by this, as well as the discovery. The Superior Court of that county, equally with the Superior Court of Troup, has power to enjoin the Common Law suit in Troup. She may, therefore, have that suit enjoined, and the matters involved in it, and in this Equity suit, determined in an Equity suit, which shall embrace those respective matters brought in Baldwin.

In respect to this maxim, "Equity follows the Law", no more is intended to be said, than that it applies to such a case as this. There is nothing inconsistent with this, in the *decision* of this Court, in *Jordan et al. vs. Jordan*, a case between these same parties. (12 *Ga. Rep.* 77.) In the opinion of the Court, in that case, there are expressions which, perhaps, in effect, deny the application of this maxim to this case; but if they do, they are but *obiter dicta*. The whole spirit of the opinion is in favor of the applicability of the maxim.

[2.] These things being so, the Court below was wrong, in holding that it had jurisdiction over the defendants in the Equity suit, for the purpose of giving the plaintiff *relief* against them.

[3.] But Courts of Equity have jurisdiction to compel discovery, in cases in which they have none to grant relief. And this is one of those cases.

In the Common Law suit, the complainant in Equity had pleaded in defence, a plea of payment. The matters set forth in her bill, were sufficient, if proved, to establish the plea. In the bill, she says this, too : " that she cannot prove

many of the facts herein charged, and necessary to her defence, as aforesaid, without a resort to the conscience of said Farish and Benjamin S."

Now, it is true, that this, in strictness, is not a good allegation, to serve as a foundation for a bill of discovery. Strictly speaking, the particular facts which cannot be proved without a discovery, should be stated. But the allegation is amendable—its defectiveness was not specially insisted upon, in the demurrer; the demurrer, on the contrary, was put upon the single ground that the defendants resided in the county of Baldwin; the Court below, probably did not have its attention even drawn to this point. For these reasons, the plaintiff in the bill ought not to receive any prejudice, for the *present*, in this Court, for this defect. We assume, for the present, this allegation to be such as it should be—such as it must be made to be, by amendment, to save the bill, if hereafter specially attacked on this ground. Assuming this, the bill is a good bill for discovery.

The question of jurisdiction, as connected with the residence of the defendant, does not extend to bills for mere discovery. The rule of Law—the Constitutional rule, is confined to the trying of cases. Bills of discovery are proceedings, not for trying cases, but merely for obtaining evidence. That they should be brought in the county of the residence of the defendant, and no where else, is not within the rule, or the grounds and principles of the rule.

To the extent of *discovery*, therefore, the Court below was right in holding that it had jurisdiction of the defendants.

But it was said that Carter, not being a party to the Common Law suit, could not be a party to the Equity suit; that he was a mere witness.

The bill states that Carter is jointly interested with Jordan in the note sued on at Common Law, and in the Common Law suit and in all the matters which go to make out the payment of the note; that is, which go to establish the defence at Common Law.

This statement the demurrer admits to be true.

Taking this statement to be true, and bearing in mind that

the bill makes a case which is good against either defendant, for no more than discovery, is Carter a proper party defendant?

If the decisions which existed at the time of our Revolution, are to govern, he is; if the decisions which have been made subsequently are to prevail, he, perhaps, is not.

" A mere witness cannot be made a defendant for discovery of what he is examinable to, *unless he is interested.* If the bill charges he is interested, the defendant must *plead and support it by an answer, denying that allegation,* and *cannot demur*". This is the result of Lord *Hardwick's* decision in *Plummer vs. May,* made in 1749–1750. (1 *Ves.* 426.)

This rule is cited as Law, in a recent elementary work of the highest character, *Daniel's Chancery Practice,* 1, 397. There exist, however, several late decisions, which must be admitted to be rather opposed to its being Law. Still, none of them expressly over-rule the case which establishes it. *Plummer vs. May.* These decisions are, *Fenton vs. Hughes,* (7 *Ves.* 287.) *Irving vs. Thompson,* (9 *Sim.* 17.) *Glyn vs. Soares,* (3 *Mylne & Keen,* 450.) The decision in the last case was also repeated in the House of Lords, (1 *West.*) Of these, the oldest is of the year 1802, and the others of the year 1839, and later.

The case of *Glyn vs. Soares* was also in the Court of Exchequer ; and in that Court the case was decided in accordance with the rule in *Plummer vs. May,* and it was decided by an able man, Lord *Abinger.* It was from this decision of Lord *Abinger's,* that the case was carried, by appeal, to the House of Lords. They reversed the decision, but a Queen was the party in whose favor the reversal was to operate—the Queen of Portugal—and it is almost impossible not to feel that this or some other improper thing had an influence upon the House of Lords, in the production of the decision. The decision is certainly at variance with the fundamental maxim of Equity, that a Court of Equity will give relief or assistance, in cases in which a Court of Law cannot. For in the case, as it was before the House of Lords, a Court of Law could not give the remedy or assistance required, viz : a discovery from the Queen of Portugal. She was beyond the reach of any process of any

English Court. 1. She could not be served with a summons, as she lived beyond the territorial limits of the jurisdiction of British Courts. 2. And if served, being the Sovereign of a foreign nation, she was not bound to obey the precept. And she was, in fact, the real party to the Common Law suit, Soares being but her agent, and a *party*, by the Law which governed the House of Lords, cannot be compelled to testify, as a witness, against himself. *King vs. Inhabitants of Woburn.* (10 *East.* 402.)

But a Court of Equity could have accomplished the object. It could have stayed the suit at Law, until her Majesty, the Queen, had seen fit to answer the bill. And principle, it seems, requires that the Court of Equity should have been allowed to do this, as Lord *Abinger* tried to make it do it.

This being the state of the English decisions, what is a Court of Georgia to do? It is to follow the decisions of the older date—of the date prior to the Revolution of 1776. The mere fact that since the Revolution, decisions have been made in England, contrary to those made before, is not, to Georgia, evidence that those made before were wrong. It may serve to induce the Courts of Georgia to recur to first principles, to settle the conflict; it can do more.

Let us, then, in the present case, do this—recur to first prinples.

It is a first principle, that a Court of Equity will give relief or aid, if a Court of Law cannot.

Can a Court of Law give the remedy or aid sought by this bill, with respect to Carter?

It is at least somewhat *doubtful*, whether a Court of Law can compel a person to answer as a witness, with respect to any matter which may subject him to a civil action or to a *pecuniary loss;* or which may charge him with a debt. This was considered so doubtful by the British Parliament, that they passed a Law to remove the doubt. (1 *Greenlf. Ev. sec.* 450.)

It is never *certain* that the summons of a Court of Law will reach a person as a witness; nor, if it reaches him, is it certain.

that he will obey it. And if the person is one, who has an interest in the case adverse to that of the person who wants him for a witness, it is always certain that he has an interest in getting out of the way of service of the summons, and in refusing to obey it after service.

If the person wished to be used as a witness in the Common Law case, occupies such a relation to it as makes him, in effect, if not in form, a *party* to it, a Court of Law *cannot* compel him to swear against himself as a witness. (10 *East.* 402. *above.*)

Now this sort of relation is the one which Carter, according to the demurrer, occupies towards the Common Law suit. The note sued on, is his and Benj. Jordan's, jointly. The suit is for their joint use. It must, therefore, equally be a bar to any other suit, by Carter as by Jordan. Jordan is but the agent in the suit, for Jordan and Carter. This being so, the Court of Law can no more compel Carter to be a witness for the defendant in the Common Law suit, Mrs. Jordan, than it can compel B. Jordan to be.

But a Court of Equity can compel a discovery from either or both. According to principle, therefore, it seems that it should compel it.

[3.] This Court feels justified, therefore, in following the older decisions of the English Courts, at least a part of the way. It considers itself safe in holding that a bill for discovery will lie against a person who has an interest in the Common Law suit, of *such a kind* as makes him, in effect, *a party* to that suit, although he is not named in it as a party.

But the defendants, by *pleas*, denied the allegations in the bill, to the effect that Carter was equally interested with Jordan, in the note and suit. They pleaded that Carter had no interest in the note or the suit. If this was true, the reasons for making Carter a party had no existence, and he should not have been made one. The Court below erred, therefore, in holding the pleas, in this respect, to be insufficient. If true, they were sufficient.

But one other decision remains for notice—the order requi-

ring the defendants to answer the bill by the first day of the next term, and in default thereof, adjudging that the bill should be taken as confessed.

[5.] It is somewhat doubtful whether any order, of any sort, for taking a bill for confessed, can, under the fifty-third section of the Judiciary Act of 1799, be made at the *first* term of the bill. If any, of any sort, can be made, it ought not, as we think, to be an order absolute, but an order *nisi.* Even if, however, the order should, as in this case, take the form of a rule absolute, it would, practically, it is conceived, make no difference to the parties subject to it. For cause, the Court would set aside the rule, though absolute, for such cause as would be sufficient to prevent a rule *nisi* from passing into a rule absolute; still, as we have to decide this point, we say that an order *absolute*, to take a bill for confessed, provided it is not answered by a particular time, cannot be made at the first term as a bill; therefore, we consider the order, in this respect, to have been erroneous.